**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ APR 1 7 2012 ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

MICHAEL DOMINIC,

                Plaintiff,

     -against-

JEAN-COSME DELALOYE,

                Defendant.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**12-CV-1551 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

     Plaintiff Michael Dominic brought this suit against Defendant Jean-Cosme Delaloye, alleging that Defendant infringed on Plaintiff's copyright by copying video footage Plaintiff made as part of an unfinished documentary. Before the court is Plaintiff's motion, pursuant to 17 U.S.C. § 502(a) and Federal Rule of Civil Procedure 65, for a preliminary injunction restraining Defendant from further copying and disseminating Plaintiff's work. Plaintiff also moves, pursuant to Rule 26(d)(1), for expedited discovery of certain categories of documents related to Defendant's work and for an expedited deposition of Defendant.

     This case involves a classic copyright dispute. Plaintiff is in the process of filming a documentary called *Clean Hands* about the plight of people living in a large garbage landfill in Nicaragua called "La Chureca." The film largely focuses on a former prostitute named Luisa Dominga Aragon Morales ("Dominga") who is struggling to survive in La Chureca with AIDS and a drug addiction. Defendant, who previously worked with Plaintiff on *Clean Hands* and had access to footage of the film, has recently completed his own film called *By My Side* about the people living in La Chureca, which also focuses on Dominga.

1

Under normal usage of the term, that might sound a great deal like "copying"; the legal definition, however, is more exacting.  Only certain elements of a work are protected under copyright law; the law protects not ideas or facts about a person's life but only the original *expression* of those ideas or facts.  The question in a copyright infringement case is whether a "substantial similarity exists between the defendant's work and the *protectible* elements of plaintiff's" work—an inquiry that "focuses on whether the alleged infringer has misappropriated the original way in which the [plaintiff] has selected, coordinated, and arranged the elements of his . . . work." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63, 66 (2d Cir. 2010) (internal quotation marks omitted) (emphasis added).

The court concludes that Plaintiff has not shown a likelihood of success on the merits with respect to this essential element of his copyright claim; rather, based on the record that exists at this very preliminary stage, it appears that the alleged similarities between Plaintiff's and Defendant's works substantially relate not to protected aesthetic expressions but to unprotectible ideas and facts.  Moreover, the balance of hardships between the parties does not tip decidedly in Plaintiff's favor.

Plaintiff's motion for a preliminary injunction is therefore DENIED.  Plaintiff's motion for expedited discovery is REFERRED to Magistrate Judge Robert M. Levy for a decision, pursuant to Federal Rule of Civil Procedure 72(a).

I.      **BACKGROUND**

A.      **Facts**

Plaintiff Michael Dominic is a film documentarian and photojournalist who has been directing, filming, and producing films for over twenty years.  (Dominic Decl. of Mar. 29, 2012 (Docket Entry # 1-4) ("First Dominic Decl.") ¶ 1.)  Defendant Jean-Cosme Delaloye is a Swiss

2

journalist and radio and television documentarian.  (Delaloye Aff. (Docket Entry # 6) ¶¶ 2-5.)
Both parties reside in New York.  (Compl. (Docket Entry # 1) ¶¶ 2-3.)

In 2010, Plaintiff met Defendant while the two were in Haiti on separate assignments
documenting the earthquake that had recently devastated the region.  (First Dominic Decl. ¶ 3;
Delaloye Aff. ¶ 7.)  Defendant's photographer had become unavailable, and so he was put in
contact with Plaintiff, who had been trying to establish himself as a photojournalist.  (Delaloye
Aff. ¶ 7.)  Over the following year, Plaintiff and Defendant traveled to Central America together
several times to work on stories for the Swiss Public Radio.  (Id. ¶ 9.)

In February 2011, Plaintiff and Defendant traveled to an open-air garbage landfill in
Managua, Nicaragua, known locally as "La Chureca."  (First Dominic Decl. ¶ 5.)  Several
hundred people live in La Chureca, and many more live in the neighborhoods surrounding it.
(Id.)  On February 11, 2011, the parties agreed verbally to work together on a documentary film
about La Chureca, split the expenses evenly until they obtained financing for the project, and
split any proceeds evenly.[1]  (Id. ¶ 7; Delaloye Aff. ¶ 13.)  This documentary would eventually be
tentatively titled *Clean Hands*.  (First Dominic Decl. ¶ 23.)

The parties made three trips to Nicaragua together to obtain footage for the planned
documentary.  Plaintiff was present during the periods of March 9-21, 2011, May 5-16, 2011,

---

[1]      The parties disagree about who came up with the idea to make a film about La Chureca.  Plaintiff claims
that, prior to meeting Defendant, he had learned about La Chureca from a friend and fellow filmmaker, and had
already decided that he wanted to visit the site and perhaps create a documentary about it.  (First Dominic Decl. ¶ 6.)
Upon visiting La Chureca, he decided that he would create a documentary chronicling the lives of several subjects
residing or working there.  (Id.)  Plaintiff says that he told Defendant that he wanted to make a documentary about
La Chureca, and that Defendant expressed an interest in being involved and indicated that he would be able to obtain
financing for the project from Swiss television sources.  (Id.)
        Defendant claims that in June 2010, he proposed a story to the Swiss Public Radio about a Guatemalan
garbage dump similar to La Chureca, set up appointments with potential subjects, and visited the site together with
Plaintiff.  (Delaloye Aff. ¶ 10.)  Although Defendant did not end up using that story, he remained interested in the
subject, and later discussed the idea of a story on La Chureca with Swiss Public Radio producers.  (Id. ¶¶ 10-11.)
Defendant says that on January 2, 2011, he told Plaintiff about the idea, which is how Plaintiff came to be at La
Chureca with Defendant in February 2011.  (Id. ¶ 12.)

and July 15-August 30, 2011. (Id. ¶ 9.) Defendant was present on the first two trips and a portion of the third, July 22-August 15, 2011. (Id.)

The parties provide differing accounts of their respective roles in the project. Plaintiff claims that he "masterminded the project"; that he "[e]ssentially [ ] was acting as director, producer, and cinematographer for the project"; and that he "was responsible for determining what to film for the documentary, [ ] for performing the filming itself," and for "cho[osing] the individuals to interview and the topics to be addressed in the interviews." (Id. ¶ 10.) He asserts that Defendant's "precise role on the project was not initially defined" (id. ¶ 7) but that Defendant "effectively served as a second associate producer on the project" (Pl. Mem. in Supp. of Order to Show Cause for Prelim. Inj. & Expedited Disc. (Docket Entry # 1-3) ("Pl. Mem.") at 7). According to Plaintiff, Defendant's duties "included Spanish-language translation, securing permits for shooting, holding boom microphones and other equipment on set, [ ] liaising with the associate producer on the project who lives in Nicaragua," and interviewing certain subjects chosen by Plaintiff on topics chosen by Plaintiff. (First Dominic Decl. ¶ 14.) Plaintiff claims that Defendant never chose any of the subjects to be interviewed, never did any filming himself, and did not play a central role in shaping the narrative of the film. (Dominic Decl. of Apr. 5, 2012 (Docket Entry # 9) ("Second Dominic Decl.") ¶¶ 5, 9.)

Defendant disagrees with Plaintiff's characterization of his role. (See Delaloye Aff. ¶ 14.) He claims that he "played a central role throughout [the parties'] collaboration on the creative aspects of the film"; that he "conferred closely" with Plaintiff on "every creative aspect, starting with the choice of subjects and the general narrative arc of the film"; and that he "determined a lot of the content of the film because, of the two [parties], only [he] could speak

4

and understand Spanish" and therefore communicate with the subjects and crew.[2] (Id. ¶¶ 16-17;
see also id. ¶¶ 24-25 (asserting that Defendant "shaped the story" in his interactions with the
subjects).) According to Defendant, "[w]here Mr. Dominic turned on the camera and what he
filmed was all dependent on [the parties'] joint creative vision for th[e] film." (Id. ¶ 20.)
Defendant also claims that he filmed at least two of the movie clips using his own camera[3] and
had input in the process of editing two trailers for the films. (Id. ¶¶ 26-27.)

     The documentary was filmed in the style of "cinema verite," or "truthful cinema," which
Plaintiff describes as "a style of documentary filmmaking that combines naturalistic filming
techniques with stylized cinematic devices of editing and camerawork." (First Dominic Decl.
¶ 10.) The film focuses largely on Luisa Dominga Aragon Morales, a former prostitute living in
La Chureca who suffers from AIDS, is addicted to sniffing glue, and has a son living in an
orphanage.[4] (Id. ¶ 11.) Among other things, the film shows Dominga sniffing glue, salvaging
food from garbage being dumped from a truck (often called a "supermarket truck"), visiting the
hospital to receive treatment for AIDS, using a nebulizer, visiting a government office to try to
reestablish contact with her son, and visiting her son for the first time in years. (Id. ¶ 12.) The
documentary was filmed using high-definition digital video cameras that save digital files. (Id.
¶ 10.) Plaintiff shared with Defendant the files created from the three trips the parties made
together. (Id. ¶ 15.)

---

[2]     Plaintiff claims that he is "conversant enough [in Spanish] to stay in the country for weeks" without
Defendant present, during which time he worked "with several native Nicaraguans (who do not speak English)."
(Second Dominic Decl. ¶ 6.)

[3]     Plaintiff asserts that it was he who used Defendant's camera to film these clips. (Second Dominic Decl.
¶ 9.)

[4]     The parties disagree about who came up with the idea to interview Dominga for the film. (Compare
Delaloye Aff. ¶¶ 21-22, with Second Dominic Decl. ¶ 9.)

During their third trip to Nicaragua, the parties got into a dispute about the film.[5] (Id. ¶ 16; Delaloye Aff. ¶¶ 29-31.) On September 16, 2011, Defendant sent Plaintiff a letter "terminating [his] relationship with [Plaintiff] concerning the filming of a documentary about the Chureca." (Walden Decl. (Docket Entry # 1-5), Ex. 8, at 1.) At that time, the parties had not yet gotten as far as a "first rough cut of [the] film." (Delaloye Aff. ¶ 34.) *Clean Hands* still has not been completed.[6] (First Dominic Decl. ¶ 23; Delaloye Aff. ¶ 34.)

After sending his termination later, Defendant commenced production of his own movie about La Chureca called *By My Side.* (Delaloye Aff. ¶ 32.) According to the "Story" page on the movie's main website, *By My Side* follows Dominga and two other women "as they look for an improbable way out of the Chureca." (Walden Decl., Ex. 18.) Defendant did not use the raw footage of *Clean Hands* but rather shot the scenes for *By My Side* himself. (Delaloye Aff. ¶ 32.) He claims that he "worked with a new videographer . . . , new editor, and all new subjects except for Dominga." (Id.) He also asserts that his new film has a different focus from *Clean Hands*— whereas *Clean Hands* focuses "primarily on Dominga's illness and on La Chureca itself[,] *By My Side*'s focus is more on the nuances of Dominga's family relationships with her mother, sisters and son." (Id. ¶ 33.)

Defendant has begun to actively promote *By My Side*. He released a three-minute promotional trailer for the movie on March 15, 2012 (id. ¶ 38), which displays, among other things, Dominga sniffing glue, eating from a supermarket truck, receiving nebulizer treatment, and reestablishing contact with her long-lost son (Walden Decl., Ex. 3). Defendant has set up:

---

[5]     The details of this dispute are not important to the instant motion.

[6]     Since the termination of the parties' relationship, Plaintiff has taken two additional trips to Nicaragua (in November 2011 and April 2012) to continue filming. (First Dominic Decl. ¶ 9.) He expects to continue filming periodically this year, to conclude filming this fall, and to complete the documentary by the end of this year or in early 2013. (Id.)

(1) a website about the movie at www.bymysidefilm.com, which includes the trailer, a summary of the story, a cast list, and photos; (2) Facebook and Twitter pages promoting the movie; and (3) a page for the movie on the Independent Movie Database ("IMDb"), which states that the movie is "Completed" and is 109 minutes long. (Id., Exs. 18-22.) The full-length film apparently has not been made publicly available. (See Pl. Mem. at 9-10; Walden Decl., Ex. 18.)

On March 16, 2012, Plaintiff discovered the promotional materials for *By My Side*. (First Dominic Decl. ¶ 17.) That day, Plaintiff's counsel sent a "cease and desist" letter to Defendant's counsel demanding that Defendant remove the trailer and other content from Defendant's website. (Walden Decl., Ex. 16.) After additional correspondence and telephone conversations, Defendant ultimately refused to cease promoting *By My Side* or take down the trailer, nor did Defendant comply with Plaintiff's demand for a copy of the full-length version of *By My Side*. (Id. ¶¶ 22-23, Ex. 17.) The trailer has been disabled at three different websites pursuant to Digital Millennium Copyright Act notices served by or for Plaintiff, but is still available on the IMDb website. See www.imdb.com/title/tt2304539 (last visited Apr. 11, 2012).

On March 20, 2012, Plaintiff filed an application for copyright registration for twenty-eight of the movie files focusing on Dominga and her family, which Plaintiff titled *Clean Hands–Dominga*. (Compl. ¶ 17.) The copyright for *Clean Hands–Dominga* has been approved by the Copyright Office and assigned U.S. Copyright Registration Number PAU003603472, effective as of March 20, 2012.[7] (Walden Decl. ¶ 6, Ex. 2.)

### B.   Procedural History

Plaintiff commenced this action on March 29, 2012, alleging: (1) copyright infringement under 17 U.S.C. § 501 based on Defendant's alleged copying of *Clean Hands–Dominga* (Compl. ¶¶ 23-27); and (2) breach of the verbal contract entered into between Plaintiff and Defendant to

---

[7]      The files comprising *Clean Hands–Dominga* are attached to the Complaint. (See Walden Decl., Ex. 1.)

7

collaborate on the documentary (id. ¶¶ 29-32) (a claim that does not form a basis for the instant motion (see Pl. Mem. at 12 n.1)). The Complaint seeks injunctive relief, damages, attorney's fees, and costs. (Compl. at 7.)

On the same day that he filed the Complaint, Plaintiff submitted a "[Proposed] Order of Preliminary Injunction and Expedited Discovery" ("Proposed Order"), along with a supporting affidavit, memorandum, and exhibits. (Proposed Order (Docket Entry # 1-2); First Dominic Decl.; Pl. Mem.; Walden Decl.) The Proposed Order would: (1) enjoin Defendant, pursuant to 17 U.S.C. § 502(a) and Federal Rule of Civil Procedure 65, "from appropriating, using, or copying" *Clean Hands–Dominga*; (2) require Defendant, pursuant to Rule 26(d)(1), to produce expedited discovery of various documents—including the full-length version of *By My Side*—within seven days of service of Plaintiff's document production requests upon Defendant; and (3) require Defendant, pursuant to Rule 26(d)(1), to appear for deposition within fourteen days of service of notice upon Defendant. (Proposed Order; Pl. Expedited Req. for Produc. of Docs. & Things (Walden Decl., Ex. 24.); Pl. Expedited Notice of Dep. (Walden Decl., Ex. 25).)

On March 29, 2012, the court ordered Defendant to show cause why the Proposed Order should not issue. (Docket Entry # 5.) Defendant responded to the order to show cause with an affidavit, memorandum, and exhibits. (Delaloye Aff.; Def. Mem. of Law in Opp'n to Pl. Appl. for a Prelim. Inj. & Expedited Disc. (Docket Entry # 7) ("Def. Opp'n").) Plaintiff replied and submitted another supporting affidavit. (Pl. Reply in Supp. of Order to Show Cause for a Prelim. Inj. & Expedited Discovery (Docket Entry # 8) ("Pl. Reply"); Second Dominic Decl.) On April 6, 2012, the court heard oral argument on Plaintiff's motion for a preliminary injunction and expedited discovery, and reserved judgment on these motions. (Docket Entry of Apr. 6, 2012.)

8

## II.    PRELIMINARY INJUNCTION STANDARD

The Copyright Act of 1976 authorizes a court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, 555 U.S. 7, 22 (2008).  A plaintiff seeking an injunction in a copyright action must demonstrate:  (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor"; (2) "that [plaintiff] is likely to suffer irreparable injury in the absence of an injunction"; (3) that "the balance of hardships between the plaintiff and defendant . . . tips in the plaintiff's favor"; and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction." Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks and alteration omitted).

## III.   DISCUSSION

For the reasons set forth below, the court concludes that Plaintiff has failed to show "either (a) a likelihood of success on the merits or (b) . . . a balance of hardships tipping decidedly in [his] favor." Id. at 79.  As these failures on the first requirement for a preliminary injunction are fatal to Plaintiff's motion, the court need not address the other three requirements.

### A.    Likelihood of Success on the Merits

The Copyright Act extends protection to "original works of authorship fixed in any tangible medium of expression," including "motion pictures and other audiovisual works." 17 U.S.C. § 102(a).  The Act provides a private cause of action to a "legal or beneficial owner of an

9

exclusive right under a copyright . . . for any infringement of that particular right committed while he or she is the owner of it." Id. § 501(b).

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." Jorgenson v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). Because the court concludes (as discussed below) that Plaintiff has not shown a likelihood of success on the merits with respect to the second element of his infringement claim, the court will assume without deciding that Plaintiff has shown a likelihood of success on the merits with respect to the first element.[8]

"To satisfy the second element of an infringement claim—the 'unauthorized copying' element—a plaintiff must show both [1] that his work was actually copied and [2] that the portion copied amounts to an improper or unlawful appropriation." Id. (internal quotation marks omitted); see also Gaito Architecture, 602 F.3d at 63. "[A] plaintiff may establish [actual] copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying." Jorgenson, 351 F.3d at 51 (internal quotation marks and citations omitted). "There is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required," and vice versa. Id. at 56 (internal quotation marks omitted). Here, there is no dispute that Defendant had access to *Clean*

---

[8]     The court notes that, with respect to the first element, the Second Circuit has held that "[a] certificate of registration from the United States Register of Copyrights constitutes *prima facie* evidence of the valid ownership of a copyright." Jorgenson, 351 F.3d at 51 (citing 17 U.S.C. § 410(c)). Here, the Copyright Office has approved Plaintiff's application for copyright registration with respect to *Clean Hands–Dominga*. (See Walden Decl. ¶ 6, Ex. 2.) Defendant may, however, overcome the presumption of validity of Plaintiff's copyright by demonstrating that Defendant is a joint author of *Clean Hands–Dominga*, which would entitle him to use *Clean Hands–Dominga* as he wishes subject only to the obligation to account to Plaintiff for any profits made. See Thomson v. Larson, 147 F.3d 195, 199-206 (2d Cir. 1998); Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1073 (7th Cir. 1994). The issue of joint authorship is fact-intensive and hotly disputed by the parties (see Pl. Mem. at 13-15; Def. Opp'n at 3-4), and need not be decided on the limited record before the court.

10

*Hands–Dominga*, nor does Defendant otherwise dispute that Plaintiff has shown a likelihood of success on the relatively non-stringent "actually copied" requirement through Plaintiff's allegation that Defendant reshot scenes from *Clean Hands–Dominga*.[9]

The central question with respect to Plaintiff's motion for a preliminary injunction is whether "the portion copied amounts to an improper or unlawful appropriation." Id. The answer to that question depends on whether "a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Gaito Architecture, 602 F.3d at 63. "The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." Id. at 66 (internal quotation marks and alteration omitted). The court "ask[s] whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." Id. (internal quotation marks omitted). "When a court is called upon to consider whether [two] works are substantially similar, no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works." Id. at 64 (internal quotation marks omitted).

Crucially, the "substantial similarity" between the two works must "relate to copyrightable material." Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d 382, 390 (S.D.N.Y. 2005). Even if two works "share substantial similarities, there is no infringement unless protectible elements were copied." Id. at 392. Copyright protection "does not extend to facts," Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 70 (2d Cir. 1999), to an "idea" or "concept," 17 U.S.C. § 102(b), or to elements of a work "that flow

---

[9]     Unlike an analysis of similarity under the "improper appropriation" prong of a copyright infringement claim, "[t]he similarities under the first prong of the test need only raise a question of actual copying; they need not be substantial." Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d 382, 389 n.7 (S.D.N.Y. 2005) (internal quotation marks and alteration omitted).

naturally and necessarily from the choice of a given concept," Bill Diodato Photography, 388 F. Supp. 2d at 392; see also Williams v. Crichton, 84 F.3d 581, 587-88 (2d Cir. 1996) ("[S]equences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection." (internal quotation marks omitted)); Clonus Assocs. v. Dreamworks, LLC, 417 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) ("[T]hematic concepts which necessarily must follow from certain plot situations, are not entitled to copyright protection." (internal quotation marks and alteration omitted)). Instead, the Copyright Act protects "the original or unique way that an author *expresses* [his] ideas, concepts, principles or processes." Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992) (emphasis added).

Thus, "[i]n a copyright action, [ ] the similarity between two works must concern the expression of the ideas, not the ideas themselves." Gaito Architecture, 602 F.3d at 67. "[W]hen faced with works that have both protectible and unprotectible elements, [the court's] analysis must be more discerning"; the court must "attempt to extract the unprotectible elements from [ ] consideration and ask whether the protectible elements, standing alone, are substantially similar." Id. at 66 (internal quotation marks omitted); see also Bill Diodato Photography, 388 F. Supp. 2d at 390 ("Careful scrutiny is necessary when the protected work contains unprotectible elements."). At the same time, the court must be "principally guided by comparing the contested design's total concept and overall feel with that of the allegedly infringed work, as instructed by [the court's] good eyes and common sense." Gaito Architecture, 602 F.3d at 66 (internal quotation marks, citations, and alteration omitted).

Ultimately, the court's "inquiry necessarily focuses on whether the alleged infringer has misappropriated the original way in which the author has *selected, coordinated, and arranged* the elements of his or her work." Id. (internal quotation marks omitted) (emphasis added).

Examples of protected expression include lighting, shading, camera angle, color balance, and the selection of film and camera. See, e.g., Leibovitz v. Paramount Pictures Corp, 137 F.3d 109, 116 (2d Cir. 1998); Rogers, 960 F.2d at 307; Kaplan v. Stock Market Photo Agency, Inc., 133 F. Supp. 2d 317, 326 (S.D.N.Y. 2001); SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 311 (S.D.N.Y. 2000).

Plaintiff argues that "Defendant's blatant rip-off of Plaintiff's work becomes apparent from a simple viewing of the three excerpts from the Trailer focusing on Ms. Morales beside footage from Plaintiff's copyrighted work."[10] (Pl. Mem. at 1.) In support of his motion, Plaintiff attaches to his Complaint a copy of *Clean Hands–Dominga* (Walden Decl., Ex. 1), a copy of the trailer (id., Ex. 3), a side-by-side video comparison of the excerpts from the trailer regarding Dominga with clips from *Clean Hands–Dominga* (id., Ex. 4), a chart detailing where the allegedly overlapping clips from *Clean Hands–Dominga* may be found (id., Ex. 5), and screen shots from the allegedly overlapping clips (id., Ex. 6). The court has reviewed these materials, and concludes that Plaintiff has not shown a likelihood of success on the merits with respect to his claim that there are substantial similarities between the protectible elements of *Clean Hands–Dominga* and the trailer for *By My Side*.

As an important preliminary matter, the court must make clear certain elements of *Clean Hands–Dominga* that are *not* protectible and thus cannot form the basis of Plaintiff's copyright infringement claim: the idea to make a movie about La Chureca, the idea to interview Dominga, the facts about life in La Chureca, and the facts of Dominga's life. See 17 U.S.C. § 102(b); Nihon, 166 F.3d at 70. Thus, it makes no difference that, as Plaintiff points out, "of the hundreds of people who live in La Chureca, Defendant chose to focus on Dominga Morales—the same

---

[10]     Plaintiff does not contend that the elements of the *By My Side* trailer that do not relate to Dominga infringe on his copyright. (See Tr. of Apr. 6, 2012, at 38.)

woman that is central to Plaintiff's work." (Pl. Mem. at 19-20.) It also makes no difference that "Defendant chose to film Ms. Morales sniffing glue, scavenging from the garbage truck, eating food from the garbage truck, attending the hospital, using a nebulizer, visiting government offices, and visiting her child." (Pl. Reply at 6; see also Pl. Mem. at 20.) These are all facts about Dominga's life that Plaintiff simply does not have an exclusive right to film.[11]

Although Plaintiff's description of the infringing nature of Defendant's work frequently bleeds into unprotectible elements of *Clean Hands–Dominga* (as discussed above), Plaintiff nevertheless asserts that, "as the comparison video and stills demonstrate, Defendant copied not only Plaintiff's ideas, and his storyline, but also Plaintiff's expression of those ideas on film." (Pl. Mem. at 20; see also Pl. Reply at 4.) The court disagrees for four main reasons.

First, because *Clean Hands–Dominga* (and *Clean Hands* as a whole for that matter) currently consists only of raw footage that has not been arranged in any particular manner (see Walden Decl., Ex. 1), the court cannot find any substantial similarity in terms of how the parties "selected, coordinated, and arranged the elements" of their works. Gaito Architecture, 602 F.3d at 66. Indeed, so far as the court can tell, Plaintiff has *not yet* "selected, coordinated, and arranged the elements" of his film. The series of clips that Plaintiff uses for his side-by-side comparison appears to have been *specifically crafted to align* with the arrangement of scenes displayed in Defendant's trailer (see id., Ex. 4), presumably in order to make the comparison

---

[11]    Plaintiff finds it particularly egregious that the "Trailer shows clips of Ms. Morales seeking to 'reestablish' contact with her son" even though "Plaintiff *had already documented this event previously*." (Pl. Mem. at 2.) But to the extent that the portrayal of this event in Plaintiff's film is more "authentic" than the portrayal in Defendant's film (a fact that Defendant disputes (see Tr. of Apr. 6, 2012, at 27-28)), that does not make Defendant's portrayal an infringement; the fact remains that Dominga *did* attempt to reestablish contact with her son, and Defendant was entitled to document this fact so long as he did not copy the manner in which Plaintiff expressed the event. Indeed, even scenes that are *not* based on "historical facts" are not protectible if they are "basic plot ideas," which a woman reuniting with her son surely is. Crane v. Poetic Prods. Ltd., 593 F. Supp. 2d 585, 596 (S.D.N.Y. 2009) (pope's succession and death were basic plot ideas and were not protectible even though they were not based on historical facts). Similarly, Plaintiff's assertion that Defendant "literally coaxed [Dominga] to . . . sniff glue *again* and eat food from a dump truck *again*" (Pl. Reply at 1) is also irrelevant; Defendant was entitled to film Dominga performing acts that she performs regularly, regardless of whether he "coaxed" her to do them.

more compelling for the purposes of this litigation. Plaintiff does not allege that he previously arranged the clips comprising *Clean Hands–Dominga* in the manner they are arranged in his comparison video, let alone that Defendant had access to any such arrangement. In other words, Plaintiff has done some copying of his own—he has assembled the clips comprising *Clean Hands–Dominga* so that they will most closely resemble the arrangement in the *By My Side* trailer. But that arrangement is *Defendant's* work, not Plaintiff's.[12]

Second, at oral argument, Plaintiff suggested (albeit without having viewed the full-length version of *By My Side*) that the final version of the portion of *Clean Hands* related to Dominga will likely look very different from Defendant's film. Plaintiff's counsel represented that "plaintiff's film is a documentary about Ms. Morales over a period of time, taking a very serious in depth look at her life." (Tr. of Apr. 6, 2012, at 19-20.) He characterized Defendant's film as a more "rushed" version (id. at 20) and suggested that it focuses on a "single slice of these people's lives" (id. at 38; see also id. ("There's going to be more time covered in my client's movie . . . .")). Defendant's counsel agreed that the "arc" of *By My Side* is different from the "long-term [ ] arc" of *Clean Hands*. (Id. at 40.) In other words, according to Plaintiff himself, it appears that *Clean Hands* and *By My Side* will be very different films even with respect to Dominga's story alone—whereas *Clean Hands* will be a holistic portrayal of Dominga's life, *By My Side* is more narrowly focused.

Third, even comparing Defendant's trailer with the raw footage comprising *Clean Hands–Dominga* as Plaintiff has arranged it in Exhibit 4 to the Walden Declaration, the court

---

[12]     The court does not suggest that it is impossible to infringe on the copyright to an unfinished work product; if that were true, after all, an infringer could evade the Copyright Act simply by rushing to complete his infringing work before the protected work is completed. But where, as here, the plaintiff's work consists only of an uncoordinated assortment of raw footage, he will have great difficulty showing that the alleged infringer copied the manner in which he "selected, coordinated, and arranged" the elements of his work, or that "the total concept and overall feel" of the two works are substantially similar. Gaito Architecture, 602 F.3d at 66. And submission of a made-for-litigation comparison video specifically designed to align with the way the *alleged infringer* "selected, coordinated, and arranged" the elements of his work is not particularly helpful.

finds that there are important aesthetic differences between the two works. See Gaito Architecture, 602 F.3d at 66. Although the court declines to conduct an exhaustive frame-by-frame discussion of the two works, it has reviewed Plaintiff's comparison video closely and disagrees with his contention that the "camera angles, camera placement, 'cinema verite' film style, lighting, and subject matter . . . look the same." (Pl. Reply at 5.) The court agrees with Defendant that his trailer is often differently lit, blurrier, and shot at a different angle or distance from the subject matter (see, e.g., Walden Decl., Ex. 6, Clips 2-3, 6, 9-10, 16, 19, 63, 80); indeed, it often involves entirely different people (see, e.g., id., Clips 28-30, 36).

Plaintiff dismisses the differences identified by Defendant as "minor variations" and argues that they "do not detract from the overwhelming similarities" between the works. (Pl. Reply at 5.) But because Plaintiff's film currently has no discernible structure and there is no copyright protection for the choice of subject matter in Plaintiff's film, the elements that inevitably flow from that choice, and the facts that the film portrays, it is *Plaintiff* who must rely on these "minor" details to show that his manner of expression has been copied. See Gaito Architecture, 602 F.3d at 66 ("when faced with works that have both protectible and unprotectible elements," the court must "attempt to extract the unprotectible elements from [ ] consideration and ask whether the protectible elements, standing alone, are substantially similar"). The court finds that, even if it were to take Plaintiff's made-for-litigation arrangement of footage on its own terms (and as discussed above, it cannot), there are important differences in the manner in which the footage itself has been created.

Fourth, many of the alleged similarities in the comparison video cited by Plaintiff result from standard filmmaking techniques that are not original to Plaintiff—for example, a straight-on shot of Dominga's face (see Walden Decl., Ex. 6, Clip 2), the filming of Dominga's

legs and feet as she walks (id., Clip 10), a direct shot of a garbage truck (id., Clips 13-15), and an aerial shot of La Chureca (id., Clip 27). These similarities cannot form the basis of Plaintiff's infringement claim.[13] Cf. Lewinson v. Henry Holt & Co., 659 F. Supp. 2d 547, 575 (S.D.N.Y. 2005) (no copyright protection for sequence of scenes in allegedly infringing manuscript for children's book because they were "standard and unprotectable method[s]" of conveying theme); Bill Diodato Photography, 388 F. Supp. 2d at 392 (no copyright protection for photograph "of the bottom part of a woman's legs in a bathroom stall or on a toilet" because it was "standard for [a] photographer to take such a photograph from or near the floor"); Harbor Software, Inc. v. Applied Sys., Inc., 925 F. Supp. 1042, 1051 (S.D.N.Y. 1996) (no copyright protection for security features in database because they involved "standard techniques found in every database program"); Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos., Inc., 463 F. Supp. 902, 905 (S.D.N.Y. 1978) (filming of wrestler Dan Gable "working out at home, jogging in his neighborhood, walking to class, and competing in wrestling matches" involved content that could not "vary greatly from film to film even when two films are produced entirely independently," and thus was not protectible).

In sum, the court does not find that "a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's"; thus, Plaintiff has not shown a likelihood of success on the merits with respect to the "unauthorized copying" element of his infringement claim. Gaito Architecture, 602 F.3d at 63; Jorgenson, 351 F.3d at 51.

### B.  Serious Questions and Balance of Hardships

A plaintiff who has not shown a likelihood of success on the merits may alternatively obtain a preliminary injunction by showing "sufficiently serious questions going to the merits to

---

[13]     The court certainly does not mean to denigrate Plaintiff's impressive work or to suggest that his footage lacks artistic merit. The court simply finds, from the standpoint of an "average lay observer," that certain elements of Plaintiff's work appear to result from standard methods of filmmaking. Gaito Architecture, 602 F.3d at 66.

make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor." Salinger, 607 F.3d at 79; see also Citigroup Global Markets, Inc. v. VCG Special Opps. Master Fund Ltd., 598 F.3d 30, 32 (2d Cir. 2010) ("serious questions" standard "remains valid in the wake of recent Supreme Court cases").[14] "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." Citigroup, 598 F.3d at 35. "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." Id. (citation omitted).

The court need not decide whether there are "serious factual questions going to the merits to make them a fair ground for litigation" because Plaintiff has not shown "a balance of hardships tipping decidedly in [his] favor." Salinger, 607 F.3d at 79. To the contrary, the alleged harms identified by Plaintiff apply essentially equally to both parties; each party claims that if the other prevails, he will suffer harm as a result of: (1) the limited sources of funding and avenues of distribution for projects on this kind of subject matter; (2) diminished ability to gain acceptance into film festivals; (3) diminished ability to sell or license the work; and (4) suppression of First Amendment rights.[15] (See Pl. Mem. at 21-23; Def. Opp'n at 12-13; Pl.

---

[14]    One court has concluded that the Second Circuit's "serious questions" standard is no longer good law after eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006). See N.Y. City Triathlon, LLC v. N.Y. City Triathlon Club, Inc., 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010) (citing Salinger, 607 F.3d at 74-75). The court finds this conclusion inconsistent with Salinger, which was decided after eBay and reaffirmed the "serious questions" alternative to the "likelihood of success on the merits" requirement. See Salinger, 607 F.3d at 79.

[15]    Plaintiff argues that any hardship to Defendant is "not legally cognizable in this case if the Court finds that there is a substantial likelihood of success on the copyright claim." (Pl. Reply at 8 (citing WPIX, Inc. v. ivi, Inc., 765 F. Supp. 2d 594, 620-621 (S.D.N.Y. 2011) ("It is axiomatic that an infringer of copyright cannot complain about

Reply at 6-9; First Dominic Decl. ¶¶ 18-22; Delaloye Aff. ¶¶ 39-40.)  If anything, because

Defendant's film has been completed, the potential harm to Defendant of an injunction is more

imminent than the harm to Plaintiff of a denial of an injunction.  Thus, the balance of hardships

does not tip "decidedly" in Plaintiff's favor.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff has failed to show "either (a) a likelihood of

success on the merits or (b) . . . a balance of hardships tipping decidedly in [his] favor."

Salinger, 607 F.3d at 79.  Because these failures preclude the grant of injunctive relief at this

stage, the court need not address the other three requirements for a preliminary injunction.

Accordingly, Plaintiff's motion for a preliminary injunction is DENIED.  Plaintiff's

motion for expedited discovery is REFERRED to Magistrate Judge Robert M. Levy for a

decision, pursuant to Federal Rule of Civil Procedure 72(a).

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       April 16, 2012

NICHOLAS G. GARAUFIS
United States District Judge

---

the loss of ability to offer its infringing product.")).)  As discussed above, however, the court concludes that Plaintiff
has not demonstrated a likelihood of success on the merits of his claim; thus, the court must consider the harm to the
Defendant of being unable to market his work.  Plaintiff also argues that Defendant will not suffer harm from an
injunction because an injunction "would not prevent Defendant from creating a documentary about La Chureca, if
he so desires, so long as it is not a substantially similar copy of Plaintiff's work."  (Pl. Mem. at 24.)  But of course,
in the absence of an injunction, Plaintiff would also have the option of creating a new documentary about La
Chureca or simply completing *Clean Hands*.